Donald SHAFFER, Nathan Shaffer,
Robert Shaffer and David
Shaffer, Plaintiffs,

v.

RWP GROUP, INC., RWP Life Associates,
Inc., Monroe Roffer, Kenneth D. Pollack
and Robert Bergner, Defendants.

No. CV 93–4081 (ADS).

United States District Court,
E.D. New York.

Oct. 19, 1996.

Ackerman, Levine & Cullen, L.L.P. by John M. Brickman, Great Neck, NY, for Plaintiffs.

Peter M. Redmond, Bayside, NY, for Defendants.

### MEMORANDUM AND ORDER

SPATT, District Judge:

The plaintiffs move, pursuant to Rule 37 of the Federal Rules of Civil Procedure and the Court's inherent power, for an order sanctioning the defendants for their alleged willful and intentional destruction of documents relevant to the issues presented in this litigation. Specifically, the plaintiffs urge this Court to (1) preclude the defendants from introducing at trial any information or data contained in the documents the plaintiffs maintain were destroyed; (2) deem conclusive the plaintiffs' calculation, based upon limited data turned over to them, of monetary damages sustained by them in the years 1989, 1990 and 1991, and correspondingly preclude the defendants from contesting same; and (3) permit the plaintiffs to "inform" the jury of the defendants alleged destruction of documents. The Court having

reviewed the parties' submissions, the motion is granted only to the extent set forth below.

## BACKGROUND

This action arises out of an Agreement of Sale (the "Agreement") between the plaintiffs, former shareholders of Donald Shaffer Associates, Inc. ("DSA"), and the defendant RWP Group, Inc. ("RWP"). The Agreement, dated November 18, 1985, took effect on February 1, 1986. The defendant RWP Life Associates, Inc. is an affiliate of RWP. The defendants Roffer, Pollack and Bergner are officers, directors and shareholders of RWP.

In the Agreement, the plaintiffs sold to RWP the assets of DSA, a general insurance brokerage business. Among the assets sold were DSA's right, title and interest in all insurance entitlements on policies placed by DSA prior to the effective date of the Agreement. In consideration for the asset sale, as well as a noncompetition covenant, DSA was to receive monthly a percentage of the commission income generated by RWP sales to former DSA customers. Pl.Aff. ¶¶ 3–4; Def. Aff. ¶ 2. The Agreement provides in pertinent part as follows:

9.4 Within fifteen (15) days following the end of each month ... [RWP] shall submit to [DSA] a schedule of the Collected Net Commissions and Fees [RWP] received during such month. Such schedule shall be deemed conclusive upon [DSA] if not contested by [DSA] or its authorized representative within six (6) months following its submission by [RWP]. [DSA] or its representative shall be permitted to audit those books and records of [RWP] that contain any of the information set forth on each schedule, upon reasonable request to [RWP], at [RWP's] place of business during [RWP's] normal business hours.

The Agreement was amended on or about March 23, 1987. The letter amendment, executed by RWP and Donald Shaffer, on behalf of Shaffer Partners, DSA's successor in interest, provides in relevant part as follows:

5. Concurrently with the execution hereof, [RWP] is paying to Seller the sum of $10,000 in settlement of all adjustments required in respect of schedules of Collected Net Commissions and Other Commissions and Fees covering the period from commencement of the Agreement through February 28, 1987. Such $10,000 ... shall not constitute an advance against Collected Net Commissions or Other Fees and Commissions.

The plaintiffs filed the instant action on September 7, 1993, alleging, among other things, that (1) RWP and RWP Life Associates, Inc. knowingly and fraudulently concealed and diverted portions of the commissions to which the plaintiffs were entitled under the Agreement, including furnishing the plaintiffs with monthly statements understating commission income earned by RWP from DSA accounts, and, correspondingly, the percentage of those commissions due and owing the plaintiffs, *see* First Amended Complaint ¶¶ 157–193; (2) all of the defendants wrongfully converted commission monies due and owing the plaintiffs, *see* First Amended Complaint ¶¶ 194–206; (3) the defendants RWP, Roffer, Pollack and Bergner breached their fiduciary duty to the plaintiffs by misappropriating and diverting commission monies, see First Amended Complaint ¶¶ 207–210; and (4) the defendants schemed to defraud Plaintiffs in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (1984 & Supp.1996), *see* First Amended Complaint ¶¶ 211–244. The instant motion relates to allegedly destroyed documents that the plaintiffs maintain will prevent them from demonstrating the amount of damages they sustained in 1989, 1990 and 1991 due to the defendants' alleged concealment and diversion of commission monies due the plaintiffs.

According to Plaintiffs, commissions generated by former DSA clients can be divided roughly into two areas: "Life" commissions, consisting of group and individual life, disability and health insurance policies, as well as pensions and financial services; and "P & C" commissions, consisting of property, casualty and liability insurance policies. There were two avenues by which RWP collected commissions on the premiums. Sometimes, RWP received a check from the insurance carrier. At other times, RWP sent premium statements directly to the insureds and with-

held their commission prior to forwarding a check to the insurance carrier.

With respect to P & C policies, the plaintiffs identify four "essential" types of documents needed to evaluate the damages they allegedly sustained: (1) customer files, including actual insurance policies; (2) ledger histories, constituting invoices sent and premiums received from individual insureds; (3) commission payables registers ("CPRs"), monthly computer-generated documents containing individual entries of commissions received by RWP with respect to each "producer," including DSA; and (4) records of RWP's payments to insurance companies. With respect to the Life policies, the plaintiffs maintain that relevant documents include miscellaneous cash receipts listings ("MCRLs"), computer-generated records that "purport to reflect the Life commissions credited to DSA by tracking the life insurance company statements," and an "adding machine tape including all of the items that, when totaled, equal the aggregate commissions shown on the top line of the monthly statement." Brickman Aff. ¶ 14. The plaintiffs state that the MCRLs have not been furnished for the years 1986, 1987, 1988 and the first six months of 1989; additionally, they claim that the adding machine tapes were "discontinued" in December 1989.

In August 1994, the plaintiffs served a document demand upon the defendants. *See* Brickman Aff.Ex. B. Item 1 sought "[b]ooks of account, general ledgers, cash receipts book, and financial records, whether in paper, electronic, or other form, of [RWP] and RWP Life Associates, Inc. ... together with banking records of RWP Life, all from February 15, 1986 to date." Item 2 sought "[c]ustomer ledger histories (or their equivalent) for DSA ... accounts from February 15, 1986 to date." Item 3 sought "[CPRs] (or their equivalent), and records from which they were compiled, from February 15, 1986 to date." In response, the defendants' attorney, by letter dated January 18, 1995, stated that certain documents had been destroyed by RWP "in the normal course of its business" for the purpose of "obtain[ing] storage space and operating space for more recent records being moved into storage and for

records on new business." *See* Brickman Aff.Ex. C. In all cases, the destruction had been authorized by the defendants Pollack and/or Bergner. *Id.*

According to the January 18, 1995 letter, the following documents and/or data were destroyed in November or December 1993; the CPRs relating to DSA for the years 1988, 1989, 1990 and 1991; RWP's general ledgers, journal entries and trial balance reports for the years 1986, 1987, 1988, 1989, 1990 and 1991; and RWP's electronic recordings of its computer database for accounting records for the years 1989, 1990, 1991 and 1992. Both Pollack and Bergner were deposed on the issue of document destruction. Pollack, RWP's treasurer, testified that he received the summons and complaint filed in the case at bar in September 1993, and that he had discussed it with his attorney. Moreover, Pollack was on notice that a lawsuit might be commenced prior to September 1993. During the summer of 1993, Pollack had a discussion with his attorney, in which Pollack recalled his attorney advising him that [the plaintiffs] were demanding "some huge sums of money." Brickman Aff.Ex. D at 30. In point of fact, the plaintiffs' attorney had met with the defendants' attorney in July 1993, and gave him copies of a draft of the original complaint filed in this action "to share ... with his clients." Brickman Aff. ¶ 20. Pollack also testified that he understood the plaintiffs were alleging in the complaint that RWP had underreported commission income generated from former DSA clients.

Pollack conceded that RWP had an obligation to preserve certain documents in connection with an ongoing lawsuit commenced in state court in 1987, in which the plaintiffs had interposed counterclaims alleging, *inter alia*, that RWP failed to collect and account for commission monies due the plaintiffs; while all of RWP's claims in the state action apparently have been dismissed, the counterclaims, interposed in November 1988, remain pending. In point of fact, the following colloquy took place at the deposition:

POLLACK: We have had and have documents of Mr. Shaffer's for the last five years, and they are put aside for—which

occurred from prior discovery, that was kept because of the discovery.

BRICKMAN: You said there are documents of Mr. Shaffer's that were put aside—

POLLACK: Yes.

BRICKMAN: —in connection with prior discovery?

POLLACK: Prior discovery.

BRICKMAN: In this lawsuit or the state case?

POLLACK: State case.

BRICKMAN: What kind of documents are there?

POLLACK: Any and all documents Mr. Shaffer asked for during discovery in the state lawsuit.

Notably, Plaintiff had served a Notice of Discovery and Inspection in the state case on or about August 25, 1989, which requested in relevant part the following:

5. The documents reflecting the amount of commissions which [RWP] earned and received in respect of life insurance business for each of the years 1986, 1987, 1988 and 1989 to date, including schedules and commission cards.

6. The schedule or other document reflecting the amount of commissions which [RWP] earned and received in respect of property and casualty insurance business for each of the years 1986, 1987, 1988 and 1989 to date.

Brickman Aff.Ex. F. at 3.

On the issue of the destruction of documents in December 1993, Pollack testified that certain documents were purged because of the acquisition of new files from another firm. Brickman Aff.Ex. D at 4. He further testified that he did not know if RWP had an "absolute policy" on document retention. *Id.* at 8. Finally, Pollack testified that he had a "general" understanding that the destroyed documents "would be old records, going further back than two years at least." *Id.* at 16. Pollack claimed ignorance as to what specific documents were disposed of; he himself did not carry out the task. *Id.* at 20–22.

The defendant Robert Bergner, president of RWP since at least January 1, 1989, was also deposed as to the destroyed documents. Bergner, who became aware of the instant lawsuit "sometime in 1993," testified that he authorized the destruction of documents on "[m]ore than one occasion" in 1993, including once in December 1993; he could not recall who he authorized to dispose of the documents, although he specified that it could have been "one of ten people." Brickman Aff.Ex. E at 9, 11–12. Bergner also did not know what specific documents were destroyed, but did state that they included "[e]very conceivable document in order to operate a business that was current." *Id.* at 19. According to Bergner, "anything that was two years or older would be destroyed, because that was [RWP's] usual procedure. I have been doing it ever since I have been in business." *Id.* at 28. Nevertheless, RWP did not have any formal written policy as regards document retention or disposal. *Id.* at 30.

In opposition to the plaintiffs' motion, the defendants rely on Section 9.4 of their Agreement with DSA, which, as noted previously, provided that the schedule of commissions forwarded to DSA each month would be deemed final if not contested by DSA within six months of its receipt thereof. Defendants note that, in reliance upon Section 9.4, they refused to supply source documents to Donald Shaffer in the state court action with respect to any commission statement more than six months old; according to the defendants, Shaffer's failure to make a motion compelling the production of the documents demonstrates his acquiescence in RWP's position.

Moreover, the defendants contend that the destroyed documents would not have been necessary for the plaintiffs to evaluate the merits of their damage claims. As to the Life commissions, they point out that the insurance commission statements for the years 1987, 1988, 1989, 1990, 1991, 1992, 1993 and 1994 have been provided, as have the MCRLs for the period from July 1989 to December 1994. With respect to the P & C policies, the defendants first point to Donald Shaffer's deposition, wherein, according to their interpretation, Shaffer testified that "he could not determine the accuracy of a com-

mission schedule from an examination of the documents which were attached to commission schedules," i.e., the CPRs. Redmond Aff. ¶ 9. Second, the defendants note that the "majority" of commission income earned by RWP is handled by computer, in which accounts are credited by producer code; DSA's code is "50." Therefore, the argument goes, "[t]he only way in which [the] [p]laintiffs' commissions due to [the] [p]laintiffs could be diverted would be a situation where the wrong producer code was assigned to a particular customer"; furthermore, "a minimal number of instances" were discovered during discovery in both the state and federal cases where such occurred. Redmond Aff. ¶ 11.

On the issue of document destruction, the defendants contend that while it may have been negligent in destroying the general ledgers and CPRs, it did not act willfully or intentionally. As to the destruction of data contained in the computer database, the defendants claim that RWP's practice of maintaining an historical copy of the database was not instituted until April 1994.

## DISCUSSION

■ It is well-settled that the Court has the inherent power to sanction a party that destroys relevant and discoverable evidence. *Shepherd v. American Broadcasting Cos.*, 62 F.3d 1469, 1476 (D.C.Cir.1995); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y.1991), *aff'd*, No. 89 Civ. 4252 (PKL), 1992 WL 51570, 1992 U.S.Dist. LEXIS 2827 (S.D.N.Y. Mar. 9, 1992); *Capellupo v. FMC Corp.*, 126 F.R.D. 545, 551 (D.Minn. 1989) (collecting cases); *see also United States v. International Bhd. Of Teamsters*, 948 F.2d 1338, 1345 (2d Cir.1991); *Penthouse Int'l, Ltd. v. Playboy Enters.*, 663 F.2d 371, 386 (2d Cir.1981). The decision to impose sanctions, as well as the appropriate sanction to be fashioned, lie within the sound discretion of the trial court. *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 268 (8th Cir. 1993); *Capellupo*, 126 F.R.D. at 550.

## I. Duty to Preserve Evidence

■ "In determining whether a court should exercise its authority to impose sanctions for spoliation, a threshold question is whether a party had any obligation to preserve the evidence." *Turner*, 142 F.R.D. at 72. A condition precedent to this Court's imposition of sanctions is whether RWP knew or should have known that the destroyed evidence was relevant to pending, imminent or reasonably foreseeable litigation. *See Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 101 (D.Colo.1996) (citing J. Gorelick et al., *Destruction of Evidence*, § 3.8, at 88 (Wiley 1989)); *Turner*, 142 F.R.D. at 72–73. Even when a party has not served a formal document request, "the complaint itself may alert a party that certain information is relevant and likely to be sought in discovery." *Skeete v. McKinsey & Co.*, No. 91 Civ. 8093 (PKL), 1993 WL 256659, at *4 (S.D.N.Y. July 7, 1993) (quoting *Turner*, 142 F.R.D. at 73).

■ In the instant case, the defendants were served with the complaint in September 1993. The defendants Pollack and Bergner, treasurer and president of RWP, respectively, testified at their depositions that they were familiar with the allegations set forth in the complaint; specifically, they knew that the plaintiffs were claiming that RWP had fraudulently and intentionally deprived them of commission monies owed them. Pollack had in fact discussed the lawsuit with his attorney upon receipt of the complaint; moreover, he conceded that in July 1993, his attorney had informed him that Plaintiffs were demanding "some huge sums of money" from RWP. *See Turner*, 142 F.R.D. at 73 ("[T]he obligation to preserve evidence even arises prior to the filing of a complaint where a party is on notice that litigation is likely to be commenced."). Therefore, the defendants clearly were on notice in September 1993, at the latest, that the documents destroyed in December 1993, many of which pertained to RWP accounts with former DSA clients, were relevant and discoverable.

The defendants contend that RWP's general ledger for 1989, as well as the CPRs for that year, may have been destroyed "prior to November 1993 since RWP does not have or

maintain[ ] any records on when documents are destroyed." Redmond Aff. ¶ 13. This argument is unavailing. First, "prior to November 1993" leaves open the possibility that the documents were destroyed subsequent to when RWP's duty to preserve the documents arose; the plaintiffs should not bear the burden of showing when destruction occurred, particularly in light of the haphazard way in which RWP disposed of its documents. Second, even assuming, *arguendo*, that the documents were destroyed prior to July 1993, the defendants overlook the fact that they were served with a document demand in the state case in August 1989 that appears to encompass such documents.

■ Finally, the Defendants rely heavily on Section 9.4 of the Agreement with DSA to justify its disposal of the documents at issue. This argument also is flawed. While the defendants' contention that the six-month limitation period provided for in Section 9.4 precludes any attack on commission payments to DSA's successors after that period may very well prove successful, RWP nevertheless destroyed the documents at their own peril. In any event, and as the plaintiffs point out, the claims of fraud and violation of the RICO statute, if proven, certainly could impair the applicability of the six-month provision.

## II. Adverse Inference Charge

Having found that the defendants had an affirmative obligation to preserve any and all documents relating to DSA for the years 1989, 1990 and 1991, and failed to do so, the Court must now address the appropriate sanction, if any, to be imposed against them.

The plaintiffs seek an order precluding the defendants from introducing at trial "any . . . information or data contained in any of the documents that in the [January 18, 1995] Redmond Letter they admit to having destroyed," as well as a directive from the Court that the plaintiffs' calculation of damages for the years 1989, 1990 and 1991, based upon the "limited data" they received and/or had in their possession, be deemed to establish conclusively the plaintiffs' damages for those respective years. Brickman Aff. ¶ 29. On the other hand, the defendants maintain

that the sanctions the plaintiffs seek are "overly broad and inappropriate" because they would preclude the defendants from introducing any information or data contained in documents which were produced, if such information overlapped with information contained in the destroyed documents. Redmond Aff. ¶ 21. According to Defendants, it would be more appropriate for the Court simply to preclude the destroyed documents.

■ "That an adverse presumption may arise from the fact of missing evidence is a generally accepted principle of law that finds its roots in the 18th century case of the chimney sweeper's boy who found a jewel ring, took it to a jeweler for appraisal, got back the ring minus the jewel, and brought an action in trover." *Welsh v. United States,* 844 F.2d 1239, 1246 (6th Cir.1988). Generally, "[w]hen the contents of a document are relevant to an issue in a case, the trier of fact . . . may receive the fact of the document's . . . destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him." *Nation–Wide Check Corp. v. Forest Hills Distribs., Inc.,* 692 F.2d 214, 217 (1st Cir.1982) (Breyer, J.). An adverse inference charge serves the dual purposes of remediation and punishment. First, it seeks to put the non-spoliator in a position similar to where it would have been but for the destruction of evidence. *See Turner,* 142 F.R.D. at 74. Second, it carries a punitive effect; " 'the law, in hatred of the spoiler, baffles the destroyer, and thwarts his iniquitous purpose, by indulging a presumption which supplies the lost proof, and thus defeats the wrongdoer by the very means he had so confidentially employed to perpetrate the wrong.' " *Id.* (quoting *Pomeroy v. Benton,* 77 Mo. 64, 86 (1882)); *see Nation–Wide,* 692 F.2d at 218 ("Allowing the trier of fact to draw the [adverse] inference presumably deters parties from destroying relevant evidence before it can be introduced at trial."). The two most important factors in determining whether an adverse inference charge is justified are the culpability of the spoliator and the prejudice accruing to the non-spoliator. *See Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79, 81 (3d Cir.1994);

*Gates,* 167 F.R.D. at 102; *Turner,* 142 F.R.D. at 74. The Court will address each in turn.

## A. Culpability

The law in this circuit is unsettled as to whether the Court must find that RWP acted in bad faith prior to permitting the jury in this action to draw an adverse inference from RWP's destruction of relevant evidence. In *Berkovich v. Hicks,* 922 F.2d 1018, 1024 (2d Cir.1991), the Second Circuit noted that "[a]bsent any evidence of bad faith, [a party is] not entitled to an instruction allowing the jury to draw an adverse inference from the destruction of [evidence]." Nevertheless, the court went on to hold that *"[o]n the facts of this case,* 'one cannot justify the drawing of ... an [adverse] inference where the destruction of evidence is unintentional,' " *Id.* (emphasis added) (quoting *INA Aviation Corp. v. United States,* 468 F.Supp. 695, 700 (E.D.N.Y.), *aff'd,* 610 F.2d 806 (2d Cir.1979)), thereby leaving open the possibility that, in certain circumstances, it would be proper for the trial court to permit the jury to draw such an inference absent an express finding of bad faith. *Compare Skeete,* 1993 WL 256659, at *6–7 (recognizing that *Berkovich* implies inference may be warranted for negligent destruction) *and Turner,* 142 F.R.D. at 75 ("[The adverse inference sanction] should be available even for the negligent destruction of documents if that is necessary to further the remedial purposes of the inference. It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently.") *with Payton v. Metro–North Commuter R.R.,* No. 93 Civ. 4840 (SS), 1996 WL 325604, at *3 (S.D.N.Y. June 12, 1996) (construing *Berkovich* as requiring finding of bad faith before giving jury adverse inference instruction) *and Stepak v. Aetna Life and Casualty Co.,* No. 90 Civ. 00886 (AVC), 1994 WL 858045, at *21 (D.Conn. Aug. 29, 1994) (same). A number of other circuits also have held that bad faith is not a prerequisite to sanctioning a spoliator with an adverse inference. *See, e.g., Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir.1995) ("While a finding of bad faith suffices to permit such an inference, it is not always necessary."); *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993); *Pressey v. Patterson,* 898 F.2d 1018, 1024 (5th Cir.1990); *Nation–Wide,* 692 F.2d at 219–20 (upholding adverse inference charge where trial court found that the spoliator's destruction of documents "transcended mere negligence and amounted to 'knowing disregard' of the [non-spoliator's] claim").

■ Of course, a party's destruction of documents not always will fit neatly into categories such as "negligent" or "willful". Instead, culpability runs "along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." *Welsh,* 844 F.2d at 1246. In the case at bar, the Court concludes that, while the defendants' conduct may not have risen to the level of bad faith, it nevertheless demonstrated a conscious and reckless disregard for their discovery obligations. RWP has been involved in litigation concerning its Agreement with DSA since 1987, and was in fact served with a document request in the state action in 1989 which encompassed most, if not all, of the documents that ultimately were destroyed. In fact, during defendant Pollack's deposition, he testified that "for the last five years" he had "put documents aside" relating to Mr. Shaffer's claims in the state action. Yet, inexcusably, and subsequent to the commencement of the instant federal action, when RWP officials clearly were on notice of the plaintiffs' claims of fraud and willful concealment with respect to commission monies, RWP took a more carefree attitude, ordering numerous and unknown persons to destroy documents relevant to this litigation in order to "make room" for new files. Compounding the defendants' culpability was RWP's utter lack of a coherent system for document retention or disposal.

In sum, while the Court may be somewhat hesitant to categorize the defendants' activities as willful and taken in bad faith, it nonetheless finds the defendants highly culpable for the destruction of the documents.

## B. Prejudice

■ "In weighing and determining the appropriateness and severity of sanctions, judges should examine the materiality and value of the suppressed evidence upon the

ability of a [party] to fully and fairly prepare for trial." *Gates,* 167 F.R.D. at 104. Here, the defendants do not contend that the destroyed documents are irrelevant, rather, they claim that the plaintiffs currently possess enough information to enable them to present evidence of damages to the jury at the trial of the cause. In determining whether the destroyed evidence will impair substantially the plaintiffs' ability to prove damages at trial, or, conversely, would have been merely " 'cumulative, insignificant, or of marginal relevance.' " *Gates,* 167 F.R.D. at 104 (quoting *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 924 (1st Cir.1988)), the Court has reviewed the parties' submissions with respect to the documents plaintiffs maintain are "essential" to proving damages for the years 1989, 1990 and 1991.

As referenced earlier, with respect to P & C commissions, the plaintiffs have asserted that the following documents are "essential"; (1) customers files, including the actual insurance policies; (2) the CPRs; (3) customer ledger histories; and (4) records of payments to insurance companies. Of the foregoing, Defendants concede that the CPRs were destroyed. Moreover, customer ledger histories, reflecting invoices billed and premiums received, appear irretrievably lost due to RWP's destruction of its computer database. Brickman Aff. ¶ 17. Finally, the January 18, 1995, letter written by the defendants' counsel in response to the plaintiffs' discovery demand reveals that "some customer files containing documents created on or after February 15, 1986, for DSA accounts" were "disposed of at sometime in the past." The plaintiffs, however, place most of their emphasis on the CPRs, computer-generated documents "compris[ing] individual entries, reflecting separate items of commission received by RWP, or payments received by RWP from its customers, or other transactions." Brickman Aff. ¶ 8. Separate CPRs were prepared for each "producer," including DSA. *Id.* According to the plaintiffs, based upon the deposition testimony of RWP employee Nancy Drozd, the monthly commission statements and corresponding checks sent to individual producers were based entirely upon the CPRs. Moreover, plaintiff Donald Shaffer testified that, while attach-

ments to the monthly statements (including the CPRs) would not, in and of themselves, enable him to determine the accuracy of the statements, it nevertheless would be "impossible" without them "to go back to the back-up or the source material in order to determine whether [the statement] was accurate." Redmond Aff.Ex. 5 at 291. In point of fact, the monthly statements sent to the plaintiffs consist merely of raw figures representing the gross income supposedly due them.

While the defendants contend that the only way commission monies could have been diverted from DSA is if the wrong producer code was entered into the computer, the plaintiffs correctly point out that the CPRs bearing the incorrect code would present the only proof of such a mistake. The plaintiffs in any event take issue with the substance of the defendants' argument, maintaining that their review of available documents revealed numerous instances of understated commissions to DSA where the CPRs reflect the correct producer code. In light of the destruction of the CPRs, customer ledger histories and "some" customer files, the Court concludes that an adverse inference instruction is warranted.

With the exception of 1989, however, the Court is not persuaded that the destruction of documents relating to the Life policies justifies a similar instruction. The defendants produced insurance commission statements for the years 1987 through 1994, as well as MCRLs for the period from July 1989 through December 1994. Redmond Aff. ¶¶ 10, 12. The MCRLs appear to be the Life counterpart of the P & C CPRs, namely, computer-generated records reflecting individual entries for each producer. The Court notes that many of the plaintiffs' arguments with respect to the Life documents go more to the merits of its claims than the issue of document destruction. Additionally, plaintiffs cite the defendants' failure to produce MCRLs for the years 1986, 1987, 1988 and the first six months of 1989, explaining that "[t]hese are the very periods in which, [they] will prove, some new Life business was written on DSA accounts, and were the periods most heavily involved with renewal commis-

sions on DSA accounts," Brickman Aff. ¶ 15; the plaintiffs only are seeking sanctions, however, for the years 1989, 1990 and 1991. Finally, the defendants' failure to produce the so-called "adding machine tape" is insufficient to justify an adverse inference charge.

## C. The Remedy

Where a party recklessly destroys relevant evidence, an adverse inference charge is appropriate where there exists "some extrinsic evidence of the content of the [destroyed] evidence ... for the trier of fact to be able to determine in what respect and to what extent it would have been detrimental." Turner, 142 F.R.D. at 77; see Skeete, 1993 WL 256659, at *7 ("[T]he lost evidence [must] bear[ ] some relationship to the inference sought."). Put another way, "it would have to appear that the evidence would have been relevant to an issue at trial and otherwise would naturally have been introduced into evidence." Vodusek, 71 F.3d at 156. The destroyed documents in the instant case not only are relevant and bear directly upon the issue of damages, but also would have been offered into evidence. Accordingly, an adverse inference is eminently appropriate.

In fashioning a sanction to remedy the defendants' document destruction, "the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." Id. at 156. The strength of the adverse inference instruction given to the jury "will vary according to the facts and evidentiary posture of a given case." Welsh, 844 F.2d at 1247. Having considered all of the circumstances, the Court will instruct the jury that it may infer from the defendants' failure to produce certain documents and/or data with respect to the DSA P & C commissions for the years 1989, 1990 and 1991 that such records would have been unfavorable to the defendants. See, e.g., Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148 (1st Cir.1996) ("When the evidence indicates that a party is aware of circumstances that are likely to give rise to future litigation and yet destroys potentially relevant records without particularized inquiry, a factfinder may reasonably in-

fer that the party probably did so because the records would harm its case."); Schmid, 13 F.3d at 78; Welsh, 844 F.2d at 1247; cf. Brown & Williamson Tobacco Corp. v. Jacobson, 827 F.2d 1119, 1134 (7th Cir.1987) ("A court and a jury are entitled to presume that documents destroyed in bad faith while litigation is pending would be unfavorable to the party that has destroyed the documents."). A similar instruction with respect to DSA Life commissions for the year 1989 will be given. Of course, the defendants remain free at trial to proffer an explanation for the missing documents. The defendants also will be precluded from introducing at trial any of the documents not produced to the plaintiffs in accordance with the plaintiffs' August 1994 demand.

**IT IS SO ORDERED.**