Robert McGINNITY,

v.

**METRO–NORTH COMMUTER RAILROAD.**

Michael Mingione,

v.

Metro–North Commuter Railroad.

Donald Whalen,

v.

Metro–North Commuter Railroad.

Nos. 3:96 CV 1147(JGM), 3:96 CV 1148(JGM) and 3:96 CV 1146(JGM).

United States District Court, D. Connecticut.

Aug. 18, 1998.

Charles C. Goetsch, George J. Cahill, Jr., John G. Dipersia, New Haven, CT, for Robert McGinnity.

Charles C. Goetsch, George J. Cahill, Jr., John G. Dipersia, Cahill, Goetsch & Dipersia, New Haven, CT, for Robert McGinnity, Michael Mingione.

Richard P. Colbert, Day, Berry & Howard, Stamford, CT, Charles A. Deluca, Michael T. Ryan, Ryan, Ryan, Johnson, McCaghey & Deluca, Stamford, CT, for Metro–North Commuter Railroad.

### RULING ON PLAINTIFFS' MOTION IN LIMINE REGARDING SPOLIATION

MARGOLIS, United States Magistrate Judge.

On June 23, 1998, plaintiffs filed the pending Motion *In Limine* Regarding Spoliation and brief in support. (Dkt. ## 26–27).[1] On July 15, 1998, defendant filed its brief in opposition. (Dkt. ## 28–29).[2] On August 10, 1998, plaintiffs filed their reply brief. (Dkt.# 33).[3]

## I. DISCUSSION

Plaintiffs Whalen, Mingione, and McGinnity were employed by defendant Metro–North as a locomotive engineer, conductor, and assistant conductor, respectively. Early in the morning of May 5, 1996, the train in which they were working passed over a person lying in the railroad tracks near the Darien, Connecticut train station. There is no dispute that the plaintiffs engaged in a radio transmission with Michael John Parsons, defendant's dispatcher (or "Rail Traffic Controller" or "RTC"), about this occurrence and that Parsons instructed plaintiffs to go back and check on this individual. (Parsons Dep. at 14, 37; Whalen Dep. at 33; Mingione Dep. at 17–18). There similarly is no dispute that defendant customarily tape records all such radio transmissions. (Parsons Dep. at 20, 32). The parties differ in their accounts of what happened next. Plaintiffs claim that about thirty seconds later, from the rear of the train, plaintiff McGinnity advised Parsons that a naked man was running behind the tracks. (Whalen Dep. at 35–36; Mingione Dep. at 17–19, 24; McGinnity Dep. at 28–29). Defendant denies that this continued conversation occurred. (Parsons Dep. at 30–32).[4] The next day, plaintiff Whalen consulted with counsel after being interviewed by a Darien police officer. (Whalen Dep. at 145–47). On May 6, 1996, counsel also sent a letter to defendant's Risk Manager, advising of his representation of each plaintiff "in his claim for damages arising out of his accident of May 6, 1996 ..." (Dkt.# 33, Exh. 3). The

---

1. Attached as Exh. 1 to the brief was a memo from defendant, dated February 11, 1997; attached as Exh. 2 were excerpts from the depositions of Michael John Parsons, taken on March 27, 1997 ["Parsons Dep."], of plaintiff Donald Whalen, taken on March 21, 1998 ["Whalen Dep."], of plaintiff Michael Mingione, taken on May 23, 1997 ["Mingione Dep."], and of plaintiff Robert McGinnity, taken on July 25, 1997 ["McGinnity Dep."].

These three lawsuits were consolidated by former Chief Judge Peter C. Dorsey on December 11, 1998. (*See* 12/11/96 endorsement on Dkt. # 9). Therefore, reference will be made solely to the docket entries in the lead file, 3:96 CV 1146(JGM).

2. Twelve exhibits were attached to defendant's brief: copies of "Voluntary Statement" by plaintiffs Whalen, Mingione, and McGinnity, all dated May 5, 1996 (Exhs.A–C); the same excerpts from the Parsons Dep. (Exhs.D–F); copy of "Chief Rail Traffic Controller's Log of Unusual Occurrences," dated May 5, 1996 (Exh. G); additional excepts from Whalen Dep. (Exhs. H & L); copies of correspondence from plaintiff's counsel to defense counsel, dated March 13, 1994 and January 27, 1997 (Exhs.I–J); and affidavit of James J. Clark, defendant's Deputy Director of Communications and Signals (Exh. K).

3. Attached as Exh. 3 were copies of three letters, dated May 6, 1996, advising defendant's Risk Manager of counsel's representation of each plaintiff "in his claim for damages arising out of his accident of May 5, 1996 ..."

4. The documents submitted by defendant are consistent with this version. (Dkt.# 29, Exhs.A–C, G).

tape recording of these radio transmissions no longer exists, as defendant's "normal course of business is to erase tapes after thirty calendar days if they are not otherwise held or restricted." (Dkt.# 27, Exh. A). Plaintiffs filed these actions more than one year later, on June 21, 1996.

In their Motion *in Limine*, plaintiffs seek to preclude defendant from calling RTC Parsons and Assistant RTC Casey O'Connor to testify in contradiction to the testimony of the three plaintiffs, and to preclude defendant from calling Communications Engineer James Clark to testify regarding defendant's procedures and practices for retaining copies of the dispatch tapes. They also seek an adverse inference charge regarding the destruction of the tape recording. *See generally* Johnston, *Federal Courts' Authority to Impose Sanctions for Prelitigation or Pre-Order Spoliation of Evidence*, 156 F.R.D. 313 (1994).

█ When faced with similar issues, courts within this circuit take into account five factors: (1) whether the party had a legal duty to preserve the evidence; (2) the degree of the party's culpability in the destruction of the evidence; (3) the relevancy of the destroyed evidence; (4) the prejudice to the opposing party; and (5) the severity of the punishment to be imposed.

## A. LEGAL DUTY TO PRESERVE THE EVIDENCE

█ "In determining whether a court should exercise its authority to impose sanctions for spoliation, a threshold question is whether a party had any obligation to preserve the evidence." *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72

(S.D.N.Y.1991), *aff'd,* No. 89 Civ. 4252(PKL), 1992 WL 51570, at *3–4 (S.D.N.Y. Mar. 9, 1992).[5] At the outset, the litigant must be on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence. 142 F.R.D. at 72. As the Magistrate Judge summarized in *Turner:*

> [N]o duty to preserve arises unless the party possessing the evidence has notice of its relevance. Of course, a party is on notice once it has received a discovery request. Beyond that, the complaint itself may alert a party that certain information is relevant and likely to be sought in discovery. Finally, the obligation to preserve evidence even arises prior to the filing of a complaint where a party is on notice that litigation is likely to be commenced.

*Id.* at 72–73 (multiple citations omitted). *See also Kronisch v. United States,* 150 F.3d 112, 127 (2d Cir.1998); *Indemnity Ins. Co. of North America v. Liebert Corp.,* No. 96 Civ. 6675(DC), 1998 WL 363834, at *3 (S.D.N.Y. June 29, 1998) ["*Liebert*"]; *Shaffer v. RWP Group, Inc.,* 169 F.R.D. 19, 24–25 (E.D.N.Y. 1996); *Skeete v. McKinsey & Co., Inc.,* No. 91 Civ. 8093(PKL), 1993 WL 256659, at *3–4 (S.D.N.Y. July 7, 1993).

█ The *Liebert* and *Kronisch* cases both involved situations, like this one, where the spoliation of evidence occurred prior to the commencement of the lawsuit. In *Liebert,* the plaintiff-insurance company did not "seriously deny that it was under a duty to preserve the evidence" giving rise to the large subrogation claim. 1998 WL 363834, at *4.[6]

---

5. The plaintiff in *Turner* had been injured in a bus accident in October 1986 on the New Jersey Turnpike. In September 1987, the defendants sold this bus to an Illinois company, transferring to this company the bus' maintenance records. The next month, in October 1987, the plaintiff commenced a negligence action against the defendants, alleging, *inter alia,* failure to provide the bus with good and sufficient brakes. In December 1989, the plaintiff requested copies of the bus' maintenance records; the defendants initially responded that the Illinois company now had possession of such records. However, through the depositions of the bus driver and the defendants' director of maintenance, plaintiff's

counsel learned that defendants had retained an additional set of maintenance records, which were destroyed by the director of maintenance in December 1989. 142 F.R.D. at 70–72.

6. The *Liebert* litigation concerned two water-cooled air conditioning units which exploded on the evening of September 1, 1993, sending water cascading at an estimated rate of 500 gallons per minute into an office building. Bankers Trust suffered extensive damage to its computer system as a result of this incident. On September 2, 1993, a vice president of Bankers Trust instructed the assistant building manager to retain the air conditioners' gaskets and heads for inspec-

In addition, the District Judge found that the plaintiff was on notice that a lawsuit was likely, so as to trigger a duty to preserve evidence, in light of "the sheer magnitude of the losses," its attempts to document the damage through photographs and reports, and its quick retention of attorneys and experts. (*Id.* at *4 n. 3). Similarly, in *Kronisch*, U.S. Circuit Judge José A. Cabranes held, just last month, that the CIA had an obligation to preserve documents regarding a clandestine operation, which documents deliberately had been destroyed two years before a Congressional investigation. 150 F.3d at 127.[7] Among the defendants' motivations in ordering the destruction of the documents was their "fear that the documents would become the subject of litigation." *Id.*

Plaintiffs contend that defendant had a duty to preserve the tape of the May 5, 1996 radio transmissions, not only in anticipation of this FELA action by the plaintiffs, but also due to pending criminal charges against the naked man, later identified as Artay Drinks. In response, defendant relies upon a March 1994 letter from plaintiff's counsel, representing another railroad employee in an unrelated matter, in which plaintiff demanded that similar tape recordings be preserved. (Dkt.# 29, Exh. I). The May 6, 1996 letters made no such demand. (Dkt.# 33, Exh. 3). Thus, defense counsel has attempted to shift the blame from his client onto plaintiff's counsel. It is undisputed that defendant's "normal course of business is to erase tapes after thirty calendar days if they are not otherwise held or restricted." (Dkt.# 27, Exh. A). Under the facts of this case, while it certainly would have been *prudent* for defendant to have preserved the May 5, 1996 tape, Metro–North was under no legal duty to do so. No attorney or insurance adjuster requested that defendant retain the tapes.

### B. CULPABILITY OF PARTY DESTROYING THE EVIDENCE

Until recently, the Second Circuit decisions were "ambiguous" whether an "adverse inference may be drawn only when it has been shown that the destruction of evidence was intentional[,]" or whether "negligent or reckless destruction of evidence may warrant such a sanction." *Turner*, 142 F.R.D. at 74–75 (multiple citations omitted).[8] *See also*

tion by investigators; no such instruction was given regarding the units' condensers, which were discarded within two months of the explosion. Within three weeks of the accident, the air conditioning units were inspected by representatives of the plaintiff-insurance company, which insured Bankers Trust, defendant Liebert, the manufacturer, and the defendant-maintenance company. In December 1993, a new management company took over the building and at some point, the former manager died. After the plaintiff-insurance company paid its insured, it commenced this subrogation claim. More than three years later, in May 1997, defendants sought an opportunity to inspect the component parts, which no longer were available. 1998 WL 363834, at *1–2.

*See also Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804, 806–07 (7th Cir.1995) (in subrogation claim against manufacturer of gas grill and spare propane tank which destroyed the home of the plaintiff-insurance company's insured, plaintiff had a duty, under well-developed Illinois law, to preserve the relevant evidence, *i.e.*, component parts of the gas grill and propane tank).

7. The facts in *Kronisch* read like a John Le Carré spy novel. The plaintiff's deceased brother, Milton Glickman, had been an artist living in Paris in October 1952, when he engaged in a lively political conversation with other Americans in a Parisian bar. At the end of the evening, a club-footed man, in an offer of conciliation, brought him a drink from the bar. After he consumed about half of the beverage, he experienced severe hallucinations, and eventually was hospitalized. He returned to the United States in July 1953 and suffered from emotional problems until his death in December 1992. In the early 1950's, the CIA conducted experiments with LSD on unwitting suspects, in the United States and abroad; the project, known as "Project MKULTRA," was led by defendant Sidney Gottlieb, who was club-footed; Gottlieb was under the supervision of defendant Richard Helms, then the CIA's Assistant Deputy Director for Plans. In January 1973, the MKULTRA records were destroyed, at the direction of Gottlieb and Helms. Congressional hearings were held regarding Project MKULTRA between 1975 and 1978. While watching these congressional hearings on television, Glickman became convinced that he had been drugged by the CIA in 1952. In December 1981, he filed an administrative claim with the CIA; in March 1983, he commenced his Federal Torts Claim Act in federal court. 150 F.3d at 116–120.

8. The court in *Turner* did not need to resolve this issue, as the conduct of defendants' counsel was "disturbing," in that their responses to plaintiff's discovery requests were "misleading at best." *Id.* at 76. Defendants' actions arose beyond

*Hester Indus., Inc. v. Tyson Foods, Inc.*, 985 F.Supp. 236, 246–47 (N.D.N.Y. 1997) ("There is a split of authority [within the Second Circuit] on whether a finding of bad faith is necessary for an adverse inference to be appropriate" and "[i]t remains unclear whether this Circuit would permit the drawing of an adverse inference for the failure to preserve evidence on the basis of negligence.") (multiple citations omitted); *Shaffer*, 169 F.R.D. at 26 (same); *Skeete*, 1993 WL 256659, at *6–7 (same).

This issue appears to have been resolved by Circuit Judge Cabranes in *Kronisch*, when he wrote: "Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was *intentionally* destroyed, and the likely contents of that evidence." 150 F.3d at 126–27 (citation omitted) (emphasis added). His explanation of the rationale for an adverse inference also reflects that the destruction of evidence cannot be merely negligent or inadvertent:

> It is a well-established and long-standing principle of law that a party's *intentional* destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction. This adverse inference rule is supported by evidentiary, prophylactic, punitive, and remedial rationales. The evidentiary rationale derives from the common sense notion that a party's destruction of evidence which it has reason to believe may be used against it in litigation suggests that the evidence was harmful to the party responsible for its destruction. The prophylactic and punitive rationales are based on the equally commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence will deter such destruction, and will properly "plac[e] the risk of an erroneous judgment on the party that wrongfully cre-

ated the risk." Finally, courts have recognized a remedial rationale for the adverse inference—namely, that an adverse inference should serve the function, insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

*Id.* at 126 (footnote & multiple citations omitted) (emphasis in original).[9]

The record presented here does not support a finding that the reusing of the May 5, 1996 tape by defendant, according to its normal business practices, constituted an intentional destruction of evidence. As the District Judge observed in *Shaffer*: "[A] party's destruction of documents not always will fit neatly into categories such as 'negligent' or 'willful.' Instead, culpability runs 'along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality.'" 169 F.R.D. at 26 (citation omitted). Even if the standard is conduct falling on the continuum somewhere beyond mere negligence but short of intentionality, Metro–North's inactions still do not arise to the level of deliberate indifference or gross recklessness.

### C. RELEVANCY OF DESTROYED EVIDENCE

As the Magistrate Judge held in *Turner*: "Before an adverse inference may be drawn, there must be some showing that there is in fact a nexus between the proposed inference and the information contained in the lost evidence." 142 F.R.D. at 76 (citation omitted). *See also Kronisch*, 150 F.3d at 127–28; *Hester Indus.*, 985 F.Supp. at 247; *Skeete*, 1993 WL 256659, at *7.

There is no dispute that the tape recordings are highly relevant here.

### D. PREJUDICE TO OPPOSING PARTY

"The next question is whether [plaintiffs] have been prejudiced by [defendant's] failure

---

mere negligence: "[A]lthough Hudson Transit did not intentionally destroy evidence, its reckless conduct did result in loss of the records, and its subsequent discovery responses misled the Court and opposing counsel." *Id. See also* note 5 *supra.*

9. The *Turner* and *Shaffer* decisions also discussed in some detail the punitive and remedial purposes of an adverse inference. 142 F.R.D. at 74; 169 F.R.D. at 25–26.

to properly preserve the evidence and, if so, to what extent." *Liebert,* 1998 WL 363834, at *4. *See also Shaffer,* 169 F.R.D. at 26–28; *Skeete,* 1993 WL 256659, at *7.[10]

In this case, all parties are equally prejudiced by the absence of the tape recording, which might have supported plaintiffs' contention in their depositions that Parsons ordered them to investigate the situation despite learning that Drinks was running around like a wild man, or might have supported defendant's position that the second conversation never occurred. Since complete discovery has been conducted by all parties in the absence of the tape recording, it cannot be said that plaintiffs alone have been prejudiced by defendant's failure to preserve the tape recording.

### E. APPROPRIATE SANCTIONS

"In fashioning a sanction to remedy the defendants' document destruction, 'the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct.'" *Shaffer,* 169 F.R.D. at 28 (citation omitted). As discussed in Sections I.A–D *supra,* the harsh remedies sought by plaintiffs—preclusion and an adverse inference instruction—are not appropriate here. As in *Skeete,* "[t]he disposition of these disputed facts and credibility issues, including any inferences which should be drawn from [defendant's] conduct, will be made by the jury at trial after hearing all the evidence and arguments from counsel." 1993 WL 256659, at *8.

In *Turner,* the Magistrate Judge held:

Denial of the requested relief does not, however, leave the plaintiff without a remedy. Even when rejecting an adverse inference, courts impose monetary sanctions for the destruction of evidence. Like an adverse inference, an award of costs serves both punitive and remedial purposes: it deters spoliation and compensates the opposing party for the additional costs incurred. Such compensable costs may arise either from the discovery necessary to identify alternative sources of information, or from the investigation and litigation of the document destruction itself.

Here, an award of costs, including attorneys' fees, is entirely warranted. Hudson Transit unjustifiably destroyed documents after litigation had been commenced, causing the plaintiff to expend time and effort in attempting to track down the relevant information. It then caused the expenditure of additional resources by misleading the plaintiff and the Court regarding the actual disposition of the records.

142 F.R.D. at 77–78 (multiple citations omitted). *But see Skeete,* 1993 WL 256659, at *8 (denying defendants attorneys' fees and costs where court declined to give adverse inference charge).

As previously discussed, the conduct of defendant here is nowhere as egregious as that of Hudson Transit and its counsel in *Turner,* because defendant never attempted to mislead plaintiff's counsel or the Court about the erased tape recording. Therefore, it is not appropriate to award plaintiffs' attorneys' fees and costs for time spent investi-

---

10. The plaintiff in *Skeete* claimed that she had been subjected to racial and sexual harassment at her place of employment, from which she eventually was terminated. For her last seven months of employment, plaintiff had tape-recorded several in-person conversations with employees, voice mail messages at her office, and conversations and messages on her home answering machine. Pursuant to defendants' discovery requests, plaintiff produced one microcassette tape and one standard-size cassette tape. At her deposition, however, plaintiff testified as to the existence of other tapes, which may have been misplaced when she relocated from New York to Atlanta, or may have inadvertently had used by plaintiff's sister to record music. 1993 WL 256659, at *1–2.

Like plaintiffs here, the defendants in *Skeete* sought to preclude plaintiff's testimony regarding the conversations or messages for which no tape recordings existed, or in the alternative, for an adverse inference. *Id.* at *2. The District Judge held that although Skeete had a duty to preserve the tape recordings, "the Court [found] Skeete's explanation *as to why the tapes were lost or destroyed to be credible,"* the defendants had not demonstrated any prejudice from the denial of access to the destroyed or lost materials, and "[i]t [was] entirely possible that the lost taped *voice mail messages and conversations were* entirely innocuous and irrelevant to any issues in this litigation." *Id.* at *3–7. Based upon the record, no sanctions were imposed against plaintiff. *Id.* at *8.

**64**

gating the disappearance of the May 5, 1996 tape recording.

## II. CONCLUSION

Accordingly, plaintiffs' Motion *In Limine* Regarding Spoliation (Dkt.# 26) is *denied.*