**Michael Ned MATHIAS f/k/a/ Nenad Matijasevic, Plaintiff,**

v.

**Bradley S. JACOBS, Defendant.**

No. 99 Civ.2004(VM) (JCF).

United States District Court, S.D. New York.

July 28, 2000.

Mark P. Weingarten, Patrick M. Reilly, DelBello, Donnellan, Weingarten & Tartaglia, White Plains, NY, for plaintiff.

Leslie A. Lupert, Robert L. Plotz, Steven Feldman, Orans, Elsen & Lupert LLP, New York City, for defendant.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

Discovery sanctions should be imposed sparingly, but in the appropriate case they may be necessary to preserve the integrity of the pretrial process. This is such a case.

In 1992, Michael Mathias and Bradley S. Jacobs, business associates in United Waste Systems Inc. ("United Waste"), had a falling-out. They attempted to resolve their differences with an agreement that Mr. Mathias would leave the company and have no contact with United Waste, its customers, and various other persons and entities in the waste disposal business for a period of two years. In return, he was granted stock options that could be exercised within the five-year period from June 1994 to June 1999. In March 1999, Mr. Mathias attempted to exercise his option, but Mr. Jacobs refused to deliver the stock. Mr. Mathias then filed this lawsuit seeking damages for breach of the agreement. In response, Mr. Jacobs contends both that the agreement was procured by duress and that Mr. Mathias forfeited any entitlement by engaging in contacts prohibited by the agreement.

Mr. Jacobs has now moved for dismissal of the complaint or, in the alternative, for an order drawing an adverse inference against Mr. Mathias on the grounds that he destroyed evidence and then made false representations to the Court concerning the destruction. Mr. Mathias has cross-moved for an order imposing sanctions on Mr. Jacobs for conducting two depositions which, according to the plaintiff, were intended to harass rather than to elicit relevant information.

*Background*

In the 1980's, Mr. Mathias and Mr. Jacobs worked together in the oil brokerage business in London. In 1989, the defendant launched a waste disposal business initially known as Jacobs Environmental Inc. and later called United Waste Services, Inc. Mr. Mathias worked as a consultant for that company from 1989 to 1992. In 1992, a disagreement arose concerning whether Mr. Jacobs was obligated to assign Mr. Mathias shares of common stock in United Waste. (Complaint ¶¶ 5, 12, 13 & Exh. A ("Settlement Agreement") ¶ 1). To resolve this dispute, the parties entered into two concurrent agreements on June 1, 1992.

In one, which shall be referred to here as the "Settlement Agreement," Mr. Jacobs granted Mr. Mathias an option to purchase 400,000 shares of United Waste stock at $3.00 per share at any time from June 1, 1994 until May 31, 1999. (Settlement Agreement ¶ 1). The Settlement Agreement refers explicitly to the second contract, which it identifies as the "Non–Compete Agreement." (Settlement Agreement ¶ 2(a); Affidavit of Leslie A. Lupert dated Jan. 12, 2000 ("Lupert Aff."), Exh. A ("Non–Compete Agreement")).

The Non–Compete Agreement notes that the parties wish to terminate Mr. Mathias' business relationship to United Waste. (Non–Compete Agreement, second unnumbered paragraph). It goes on to provide for a lump sum payment of $31,200 to Mr. Mathias for amounts owing to him, as well as twenty-four monthly payments of $8,000 each and continuation of Mr. Mathias' insurance coverage. (Non–Compete Agreement ¶¶ 1–3). In return, Mr. Mathias is obligated not to disclose any of United Waste's confidential information and not to have contact with a variety of persons and businesses related to the waste disposal industry for a period of

twenty-four months. (Non–Compete Agreement ¶¶ 4–5).

The Settlement Agreement provides that Mr. Mathias' right to stock options under that instrument will be forfeited if he violates the terms of the Non–Compete Agreement. (Settlement Agreement ¶ 2(b)). It further provides a concrete example of the type of contact that is prohibited:

> By way of illustration, the Option shall be automatically and unconditionally rescinded and terminated should [Mr. Mathias] contact, telephone or send a letter to any officer of [United Waste] other than its Chief Executive Officer, or should [Mr. Mathias] contact, telephone or send a letter to any family member of any officer including its Chief Executive Officer.

(Settlement Agreement ¶ 2(c)).

In March 1999, Mr. Mathias tendered $1,200,000.00 to Mr. Jacobs, seeking to exercise his option. Mr. Jacobs, however, rejected the tender and refused to deliver the stock. Mr. Mathias then commenced this action.

Additional factual background will be provided in connection with the discussion of the parties' respective motions.

*Destruction of Evidence*

Mr. Jacobs has moved for sanctions on the basis that Mr. Mathias destroyed materials that were subject to discovery and then misrepresented to the Court that he had produced all responsive information. The defendant seeks either dismissal of the complaint or imposition of an adverse inference. Evaluation of this argument requires a detailed chronology of the pertinent discovery.

At the initial session of Mr. Mathias' deposition on April 16, 1999, he was asked questions about any diaries that he maintained. Among other things, he acknowledged that he had begun using a Palm Pilot as an address book about six months before. (Deposition of Michael Ned Mathias ("Mathias Dep.") at 93–94, attached as Exh. C to Lupert Aff.). On April 26, 1999, counsel for Mr. Jacobs served Defendant's First Request for Production of Documents on Mr. Mathias. Among other things, it sought "[a]ll diaries, appointment books, calenders [sic], sched-

ules, electronic organizers, and itineraries of any kind, in any form, from June 1, 1992 to present" and "[a]ll telephone directories, Rolodex cards, diaries, organizers, electronic organizers, and documents of any kind concerning the names, addresses, or phone numbers of any people or entity plaintiff has contacted in any way from June 1, 1992 to present." (Lupert Aff., Exh. D ¶¶ 13, 14). In response, Mr. Mathias produced a number of documents but not the Palm Pilot. Accordingly, on July 1, 1999, defendant's counsel wrote a letter specifically requesting production of the Palm Pilot as well as other information. (Lupert Aff., Exh. G). Plaintiff's counsel declined to produce the Palm Pilot on the ground that the information it contained was irrelevant. (Lupert Aff., Exh. H). This dispute was ultimately presented to me, and on September 17, 1999, I ruled that the Palm Pilot should be produced on an "attorneys' eyes only" basis.

Approximately a week later the Palm Pilot was produced, and it contained more than 1,200 names, indicating that its database included contacts extending back beyond the date when the Palm Pilot itself was acquired. (Lupert Aff. ¶ 12). On September 27, 1999, defendant's counsel repeated the request for telephone lists "kept in any form whatsoever." (Lupert Aff., Exh. O). Plaintiff's counsel responded that a search had confirmed that no additional lists existed. (Lupert Aff., Exh. P). Concluding that further information must have been in Mr. Mathias' possession, defendant's counsel sought sanctions. Plaintiff's counsel replied as follows:

> Plaintiff currently uses a Palm Pilot. In context, plaintiff's testimony is clear that he no longer uses a written telephone directory (a fact confirmed by the amount of names, addresses and phone numbers in the Palm Pilot).

> Plaintiff testified that there was a time during the 1990s when he had a practice of keeping phone numbers in written form in a telephone directory of the type commonly inserted in annual personal diaries or appointment books. Each year when he got a new diary, he would keep the old telephone directory and insert it in the new diary. However, he testified he

stopped this practice and no longer has the old directory (except he did have his handwritten directory from the earlier period—which was produced).

Defendant's counsel now has plaintiff's current Palm Pilot telephone directory which he testified he had been using for more than six months prior to this lawsuit. Defendant can obviously see that plaintiff had no need to retain pieces of paper on which he may have occasionally jotted a phone number if the information was thereafter recorded on his Palm Pilot. Moreover, any suggestion that plaintiff destroyed any documents to circumvent a discovery request is unfounded and explicitly denied by plaintiff.

(Lupert Aff., Exh. R (citations to deposition omitted)). Plaintiff's counsel further represented that the Palm Pilot contained only "names and phone numbers for everyone with whom plaintiff presently deals." (Lupert Aff., Exh. R).

However, Mr. Mathias' testimony at his continued deposition on December 16, 1999 and January 3, 2000 demonstrate that these representations were inaccurate. According to the plaintiff, during the summer of 1999, he located in an apartment in Spain an old computer printout containing telephone listings from the 1980's. (Mathias Dep. at 619–20, 627–28, 777–79; Affidavit of Michael Mathias dated Jan. 22, 2000 ("Mathias Aff.") ¶¶ 2–6). This printout had been created by his assistant, Gabriel Casadio, and Mr. Mathias apparently never used it. (Mathias Aff ¶ 12; Declaration of Gabriel Casadio dated Jan. 21, 2000 ¶¶ 2–4). Because he wanted to test the skills of a secretary who was being considered for work on a new venture, Mr. Mathias had her impute the contents of the computer printout into the Palm Pilot. (Mathias Dep. at 626–28; Mathias Aff. ¶¶ 7–8). In addition, this secretary transferred address and telephone information from various sheets of paper and business cards to the Palm Pilot (Mathias Dep. at 792–93; Mathias Aff. ¶ 13). Mr. Mathias paid the secretary in cash and does not know her last name though he employed her over a period of thirty to forty days. (Mathias Dep. at 626–27, 784–85). After the secretary input the information into the Palm Pilot, Mr. Mathias discarded or directed her to discard both the computer printout and the other documents from which she had obtained the data. (Mathias Dep. at 628, 792–93, 795).

Mr. Mathias offers several reasons why he should not be sanctioned for the destruction of these materials. First, he did not consider the computer printout relevant since it was maintained prior to the period when the Non–Compete Agreement was in effect. Second, he did not use the printout. Third, the printout had no connection with the waste disposal industry. And, finally, the information from the printout and the other documents had been transferred into the Palm Pilot without alteration.

### A. The Court's Authority

It is well settled that a district court has the authority to impose sanctions for the destruction of evidence. Where spoliation prevents a party from complying with a discovery order, sanctions may be awarded pursuant to Rule 37(b) of the Federal Rules of Civil Procedure. Moreover, even in the absence of violation of a court order, the court has inherent power to sanction the destruction of evidence as part of its authority to control litigation. See West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir.1999); Shaffer v. RWP Group, Inc., 169 F.R.D. 19, 24 (E.D.N.Y.1996); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y.1991).

Any sanction imposed should serve prophylactic, punitive, and remedial purposes. See West, 167 F.3d at 779. That is, it should be designed to deter future spoliation of evidence, to shift the risk associated with the absence of proof to the party responsible for the loss of evidence, and to remedy any prejudice suffered by the opposing party. See id. at 779; Kronisch v. United States, 150 F.3d 112, 126 (2d Cir.1998); Textil RV LtdA v. Italuomo, Inc., No. 92 Civ. 526, 1994 WL 48815, at *3 (S.D.N.Y. Feb. 17, 1994); Turner, 142 F.R.D. at 74.

A court's power to impose sanctions for spoliation includes the discretion to dismiss the complaint. See West, 167 F.3d at

779. "Dismissal is appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party. However, because dismissal is a drastic remedy, it should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Id.* (internal quotations and citations omitted).

■ In this case, the defendant has suggested imposition of an adverse inference as an alternative remedy. It is therefore appropriate to determine first whether this less draconian relief would be sufficient.

## B. *Adverse Inference*

Mr. Mathias' personal address books and telephone directories are relevant to the defendant's contention that he had prohibited contacts in violation of the Non–Compete Agreement and therefore forfeited his entitlement to stock options under the Settlement Agreement. Accordingly, the defendant requests an inference that the discarded computer printout and other materials contained the names of persons or entities that Mr. Mathias was barred from communicating with and that he destroyed the records to cover up the fact that he had had contact with them.

■ To determine whether an adverse inference is warranted, a three-step analysis may be followed. First, as with any claim of spoliation, it must be determined whether Mr. Mathias was under any obligation to preserve the records at issue. *Kronisch,* 150 F.3d at 126–27; *Turner,* 142 F.R.D. at 72. If not, the analysis ends there. If the plaintiff did have such a duty it is necessary to go on to examine both whether the destruction of evidence was willful and whether the evidence would likely have supported the conclusions that the jury would now be asked to infer. *Kronisch,* 150 F.3d at 127; *see also Turner,* 142 F.R.D. at 74.

### 1. *Duty to Preserve Evidence*

■ A party is obligated to retain evidence that it knows or reasonably should know may be relevant to pending or future litigation. *See Kronisch,* 150 F.3d at 126; *McGinnity v. Metro–North Commuter Rail-*

*road,* 183 F.R.D. 58, 60 (D.Conn.1998); *Indemnity Insurance Co. of North America v. Liebert Corp.,* No. 96 Civ. 6675, 1998 WL 363834, at *3 (S.D.N.Y. June 29, 1998); *Shaffer,* 169 F.R.D. at 24; *Turner,* 142 F.R.D. at 72–73. Obviously service of a discovery demand places a party on notice to preserve the materials explicitly requested, but the duty to preserve arises whenever a party has been served with a complaint or anticipates litigation. *See Kronisch,* 150 F.3d at 126; *McGinnity,* 183 F.R.D. at 60; *Turner,* 142 F.R.D. at 73.

■ In this case there is little doubt that Mr. Mathias had a duty to retain his telephone lists in whatever form. From the time that the defendant answered the complaint in April 1999, the plaintiff was on notice that one of the central issues in the case is whether he had any prohibited contacts during the period from June 1992 to June 1994. Moreover, in April 1999, the defendant also served discovery demands on Mr. Mathias which required him to produce telephone directories and other documents "concerning the names, addresses, or phone numbers of any people or entity plaintiff has contacted in any way from June 1, 1992 to present." (Lupert Aff., Exh. D ¶ 14).

■ Mr. Mathias suggests three reasons for believing that the computer printout and other records were not relevant to this litigation, none of which is persuasive. First, he notes that the printout was maintained prior to 1992. (Mathias Aff. ¶ 12(a)). However, the fact that it was created in the 1980's hardly means that it does not "concern" persons that he contacted thereafter. Indeed, the fact that he had the information transferred to the Palm Pilot that he currently uses indicates that it has ongoing utility to him. Second, Mr. Mathias argues that he never used the printout. But, again, it is relevant if it contains identifying information about persons he contacted, even if he referred to other listings in order to locate them. Finally, the plaintiff contends that the printout bore no relationship to the waste disposal industry. If true, this would seriously limit its utility in this litigation. However, defendant's counsel were entitled to test the accuracy of that assertion, and their

discovery requests swept broadly enough to encompass the printout. Thus, the plaintiff had an obligation to preserve the printout and other directory materials, and he breached that duty.

### 2. *Intent*

 Courts have long been divided on whether it is necessary to prove that the destruction of evidence was intentional in order for an adverse inference to be warranted. *See McGinnity*, 183 F.R.D. at 61–62; *Shaffer*, 169 F.R.D. at 26; *Turner*, 142 F.R.D. at 74–75. In *McGinnity*, the court perceived the decision in *Kronisch* as finally resolving this issue in the Second Circuit. The *Kronisch* opinion had noted that a court evaluating an adverse inference must " 'consider whether the evidence was *intentionally* destroyed, and the likely contents of that evidence.' " *McGinnity*, 183 F.R.D. at 62 (quoting *Kronisch*, 150 F.3d at 126–27) (emphasis added in *McGinnity*). Further, the *Kronisch* court had stated that " 'a party's *intentional* destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.' " *Id.* (quoting *Kronisch*, 150 F.3d at 126) (emphasis in original). From this, the *McGinnity* court concluded that imposition of an adverse inference required a showing of intent. *Id.*

But to say that intent is an important consideration is not the same as holding that it is a prerequisite. The Second Circuit confirmed this distinction in *Reilly v. NatWest Markets Group Inc.*, 181 F.3d 253 (2d Cir. 1999), *cert. denied,* 528 U.S. 1119, 120 S.Ct. 940, 145 L.Ed.2d 818 (2000). There, the Court said, "[w]e do not read either *Kronisch* or *Berkovich [v. Hicks*, 922 F.2d 1018 (2d Cir.1991) ] as an absolute prohibition against granting an adverse inference instruction where there is no bad faith but there is gross negligence. To the contrary, we have previously approved more severe sanctions based solely on gross negligence." *Id.* at 267 (citation omitted). The Court described its rationale as follows:

> Our case-by-case approach to the failure to produce relevant evidence seems to be working. Such failures occur along the continuum of fault—ranging from innocence through the degrees of negligence to intentionality. Trial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing—a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case. As other Circuits have recognized, it makes little sense to confine promotion of that remedial purpose to cases involving only outrageous culpability, where the party victimized by the spoliation is prejudiced irrespective of whether the spoliator acted with intent or gross negligence.

*Id.* at 267–68 (internal quotations and citations omitted). Accordingly, the Court concluded that "a finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator with an adverse inference instruction." *Id.* at 268.

In this case, Mr. Mathias demonstrated at least a conscious and reckless disregard of his discovery obligations. *See Shaffer*, 169 F.R.D. at 26. He was well aware of the defendant's specific discovery demands, as demonstrated by the fact that his counsel produced some responsive documents in May 1999. (Lupert Aff., Exh. F). Nevertheless, without consulting counsel, Mr. Mathias discarded materials that fall within the scope of those demands, purportedly based on his unilateral determination that they were not relevant. As will be discussed below, the pertinent information that was destroyed can be reconstructed. Therefore, I doubt whether Mr. Mathias acted with the intent to obstruct discovery, since he would have known that his efforts would be futile. However, the plaintiff is sufficiently culpable for the spoliation to warrant an adverse inference if there is substantial prejudice to the defendant.

### 3. *Content of the Evidence*

 Whether a party has been prejudiced by spoliation depends largely on the content of the evidence destroyed. Accordingly, the Second Circuit has held that "before we permit the drawing of an adverse inference, we require some showing indicating that the destroyed evidence would have

been relevant to the contested issue." *Kronisch,* 150 F.3d at 127. Beyond that, the loss of the evidence must impede the moving party's ability to address issues in the case.

Prejudice from the destruction of evidence can range from serious to modest. In some cases, there may be no harm at all as a result of an opponent's loss or destruction of evidence. In weighing and determining the appropriateness and severity of sanctions, judges should examine the materiality and value of the suppressed evidence upon the ability of a victim to fully and fairly prepare for trial. On the one hand, where the destruction of evidence results in substantial impairment to a party's abilities to prepare for trial, serious sanctions might be warranted. On the other hand, concealed evidence may turn out to be cumulative, insignificant, or of marginal relevance. In such circumstances, dispositive sanctions would undoubtedly constitute an overreaction, but sanctions of less severity would perhaps be appropriate.

*Gates Rubber Co. v. Bando Chemical Industries, Ltd.,* 167 F.R.D. 90, 104 (D.Colo.1996). Thus, where the victim of the spoliation has alternative means of obtaining equivalent evidence or where the destroyed evidence is cumulative, neither an adverse inference nor dismissal of the complaint may be an appropriate sanction. *See New York State National Organization for Women v. Cuomo,* No. 93 Civ. 7146, 1998 WL 395320, at *3 (S.D.N.Y. July 14, 1998) (preclusion order denied where destroyed evidence was cumulative and parties had alternative means for obtaining information); *Indemnity Insurance Co.,* 1998 WL 363834, at *5 (no prejudice where substantial evidence on issue otherwise available); *Shaffer,* 169 F.R.D. at 27–28 (adverse inference warranted where unique evidence destroyed, not where evidence was cumulative).

▓▓▓ Here, Mr. Mathias has represented that, to his knowledge, the substance of the discarded materials was all transferred to the Palm Pilot which has been produced pursuant to my order. To the extent that this representation is true, the documents destroyed were entirely cumulative.

But even if the computer printout and other materials contained additional data, their destruction has not prevented the defendant from ultimately obtaining the relevant information. Lists of names and telephone numbers would not by themselves have proven that Mr. Mathias had contact with any of those persons during the prohibited period. At best, the telephone numbers could be compared to the plaintiff's telephone records as a means of identifying his contacts. But the defendant and his attorneys are aware of the universe of individuals whom Mr. Mathias was barred from contacting. They can therefore determine from those persons directly whether the plaintiff breached the Non–Compete Agreement. Moreover, counsel can verify the information obtained from these persons by determining whether their telephone numbers appear on Mr. Mathias' telephone billing records during the period of the ban. Thus, while it would have been helpful to the defendant to have the computer printout and related materials, their destruction has not caused the degree of prejudice necessary to justify an adverse inference, much less dismissal of the complaint.

### C. *Misrepresentations*

▓▓▓ Nevertheless, the defendant argues that an additional factor in this case—the plaintiff's misrepresentations regarding destruction of the documents—calls for the most severe sanctions. The defendant relies on *Miller v. Time–Warner Communications, Inc.,* No. 97 Civ. 7286, 1999 WL 739528, at *2–4 (S.D.N.Y. Sept. 22, 1999), where the court dismissed the complaint based on the plaintiff's intentional spoliation and her attempts to cover up the destruction. The court in that case made factual findings that:

1) plaintiff deliberately erased information from documents to prevent its discovery by the defendant; 2) plaintiff committed perjury in her deposition when questioned about when and why she erased the documents; 3) she repeated and elaborated upon this perjury at the hearing before the Court; 4) her attorney falsely stated during plaintiff's deposition that he had made many of the erasures; and, 5) counsel tes-

tified falsely at the hearing to the same effect.

*Id.* at *2. The court noted that even in light of the willful destruction of evidence, a sanction consisting of an award of attorneys' fees rather than dismissal might have been appropriate but for the plaintiff's repeated perjury about the spoliation. *Id.* at *2–3.

The facts in *Miller* are a far cry from the circumstances of this case. Mr. Mathias acknowledged using a Palm Pilot beginning in late 1998, before the complaint and answer in this action were filed. (Mathias Dep. at 1, 94). He subsequently admitted discarding hard copy directory information after inputting it into the Palm Pilot in the summer of 1999. Had the plaintiff intended to lie to cover up this destruction, he could easily have asserted that he innocently discarded the computer printouts and other papers shortly after he obtained the Palm Pilot but before this litigation commenced.

It is true that Mr. Mathias misled the Court and counsel when he represented through his attorney that "any suggestion that plaintiff destroyed any documents to circumvent a discovery request is unfounded and explicitly denied by plaintiff." (Lupert Aff., Exh. R at 3). At the time this statement was made, the plaintiff had recently disposed of the computer printout and related papers. However, this representation falls well short of perjury. There is no reason to doubt the plaintiff's assertion that he subjectively believed the telephone information to be beyond the scope of discovery since it predated the prohibited period. Furthermore, he apparently failed to understand that evidence must be preserved even if it remains available in other forms. Given his understandings, then, Mr. Mathias' denial that he destroyed any documents "to circumvent a discovery request" can be viewed as literally accurate. He denied only that he had destroyed evidence for an improper purpose; when asked specifically about the documents at issue, he admitted discarding them for reasons he considered innocent. The alleged misrepresentations, then, do not raise this case to a level where either an adverse inference or dismissal would be justified.

### D. *Costs*

▮ The reckless destruction of evidence, however, has caused the defendant to incur unnecessary costs. Under such circumstances it is appropriate to compensate the victim for attorneys' fees and expenses arising both from additional discovery required to locate equivalent information by alternative means and from the motion practice necessitated by the spoliation. *See Turner*, 142 F.R.D. at 78. Such an award, like an adverse inference, "serves both punitive and remedial purposes: it deters spoliation and compensates the opposing party for the additional costs incurred." *Id.*

Defendant's counsel have represented that a total of $44,713.25 was expended in connection with the spoliation issue. This consists of 49.0 hours of partners' time billed at $390 per hour, 97.75 hours of associates' time at $225 per hour, 45.75 hours of paralegals' time at $70 per hour, and photocopying charges of $407.00. (Affidavit of Steven D. Feldman dated March 8, 2000).

While the quality of counsel's work was excellent and their rates are consistent with those of other firms in this district in similar cases, the amount of time billed is frequently excessive. For example, 9.25 hours of attorney time were billed on August 9, 1999 for drafting only that part of a nine-page letter which related to destruction of evidence. Another 4.5 hours were billed for what appears to be one-fifth of the time spent drafting an eight-page letter sent on September 8, 1999. Nine attorney hours were expended on a six-page letter to the Court dated October 7, 1999. Another 61.0 attorney hours were spent drafting the motion for sanctions and the accompanying sixteen-page memorandum of law, while 45.5 hours were spent on the eleven-page reply.

Of course, the hours billed reflect not only time spent in actual drafting, but also time expended in reviewing the adversary's papers, assembling the record, and conducting research. Nevertheless, the hours billed for here were disproportionate to the tasks involved. The defendant shall therefore be awarded sixty percent of the attorney time billed, or $24,662.25 together with the paralegal time and costs, for a total of $28,271.75.

This amount shall be paid by Mr. Mathias, as there is no evidence that his attorneys participated in any way in the destruction of evidence.

*Deposition Conduct*

The plaintiff seeks sanctions for what he characterizes as discovery abuse in the depositions of Richard Weingarten and Alfred DelBello. In early January 2000, defendant's counsel served Mr. Weingarten with a deposition subpoena. He is a semi-retired attorney, a former City Court Judge in Yonkers, and the father of Mark Weingarten, lead counsel for the plaintiff in this case. He appeared "of counsel" in this action at one session of the defendant's deposition and at one conference.

Counsel for the plaintiff objected to the deposition of Richard Weingarten on the ground that there was no good faith basis for it since Mr. Weingarten had no relevant information. (Letter of Leslie A. Lupert dated Feb. 18, 2000 ("Lupert Letter"), Exh. A). Defendant's counsel responded that Mr. Weingarten's testimony was potentially relevant to both of the defenses in the action: the plaintiff's alleged breach of the Non–Compete Agreement and his purported use of duress to secure the Settlement Agreement with its promise of stock options. (Letter of Patrick M. Reilly dated Feb. 4, 2000 ("Reilly Letter"), Exh. C). With respect to the covenant not to compete, defendant's counsel argued that Mr. Weingarten had worked with waste companies that were business prospects for United Waste between 1989 and 1992 and that Mr. Mathias then had contact with Mr. Weingarten during the prohibited period. In connection with the duress issue, defendant's counsel noted that their client had alleged that in 1992 Mr. Mathias threatened to hire a "mob-connected lawyer" to bring frivolous litigation against United Waste (Reilly Letter, Exh. C; Lupert Letter, Exh. I). Since Mr. Weingarten had purportedly been dealing with Mr. Mathias at that time, defendant's counsel apparently wanted to ascertain if he were the lawyer with organized crime connections. (Reilly Letter, Exh. C).

Unsatisfied with the defendant's proffer, plaintiff's counsel filed a letter application dated January 10, 2000 seeking a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure precluding Mr. Weingarten's deposition. (Letter of Patrick M. Reilly dated Feb. 25, 2000 ("Reilly Reply Letter"), Exh. A). Counsel argued that (1) Mr. Weingarten had never represented the plaintiff except for the two "of counsel" appearances in this case, (2) he had never represented Mr. Jacobs or United Waste, (3) he was not involved in negotiation of the Settlement and Non–Compete Agreements, and, indeed, was a sitting judge at the time they were entered into, and (4) had never represented any person or entity listed in the document demand attached to the deposition subpoena. (Reilly Reply Letter, Exh. A).

Defendant's counsel opposed the plaintiff's application and elaborated on their rationale for seeking the deposition. They argued that before Mr. Mathias left United Waste, Mr. Weingarten had attempted to do business with the company by seeking to act both as a broker in waste-related transactions and as counsel on behalf of United Waste. Further, defendant's attorneys contended that the firm with which Mr. Weingarten was affiliated at the time represented United Waste in legal transactions. According to defendant's counsel, these contacts made Mr. Weingarten a prohibited person with whom Mr. Mathias later communicated during the prohibited period. On the duress issue, counsel noted that Mr. Jacobs had testified at his deposition that he believed Mr. Weingarten to be the "mob-connected" lawyer that Mr. Mathias had referred to in 1992. Counsel went on to assert that in an earlier conversation with Mr. Jacobs, Mr. Weingarten had bragged about his connections with organized crime figures. (Letter of Leslie A. Lupert dated Jan. 11, 2000).

Plaintiff's counsel replied that the suggestion that Mr. Mathias had contact with Mr. Weingarten during the prohibited period was based solely on Mr. Mathias' deposition testimony which did not, in fact, support such an inference. Counsel further reiterated that Mr. Weingarten was not a "mob-connected" lawyer and had never asserted that he was. (Letter of Patrick M. Reilly dated Jan. 12, 2000).

On the basis of the conflicting representations made by counsel, I declined to preclude the deposition of Mr. Weingarten. I did, however, order that:

> Defendant's counsel may proceed with the deposition of Richard Weingarten upon the condition that if the deposition fails to elicit substantial relevant information, defendant's counsel shall pay all costs and expenses of the deposition, including attorneys' fees, travel expenses, and reimbursement of Mr. Weingarten for his time.

(Memorandum Endorsement dated Jan. 14, 2000, attached as Exh. A to Reilly Reply Letter). The defendant did not appeal from that order but instead proceeded to take Mr. Weingarten's deposition.

The only potentially relevant testimony elicited at the deposition concerned two meetings that Mr. Weingarten attended prior to 1992. One meeting took place in Mr. Mathias' apartment on Central Park South. (Deposition of Richard Weingarten dated Jan. 14, 2000 ("Weingarten Dep."), attached as Exh. F to Reilly Letter, at 14). Mr. Weingarten does not recall whether Mr. Jacobs was there, the purpose of the visit, or whether anything was discussed about the waste disposal business. (Weingarten Dep. at 14). A second meeting took place at Mr. Jacobs' home in Connecticut. (Weingarten Dep. at 12–13). Mr. Weingarten remembers that Mr. Jacobs was there but is unsure if Mr. Mathias was as well. (Weingarten Dep. at 16). Mr. Weingarten had been invited to the meeting by his son Mark, who was seeking to obtain legal business from Mr. Jacobs. (Weingarten Dep. at 18–19). Mr. Weingarten testified that he only remembers meeting Mr. Mathias twice, and did not socialize with him. (Weingarten Dep. at 15–16). He never represented either Mr. Mathias or Mr. Jacobs and had no contact with Mr. Mathias from the time he became a judge in 1992 until after this case was filed in 1999. (Weingarten Dep. at 21, 26–27). Defendant's counsel did not question Mr. Weingarten about any link to organized crime or any other subject related to the duress defense.

Immediately before taking Mr. Weingarten's deposition, defendant's counsel had deposed Alfred B. DelBello. Mr. DelBello had been Mayor of the City of Yonkers, County Executive of Westchester County, and Lieutenant Governor of the State of New York and was now a partner in the law firm representing the plaintiff. After Mr. DelBello was served with a deposition subpoena on Christmas Eve, plaintiff's counsel sent defendant's counsel a letter objecting on the ground that the deposition was not intended to elicit relevant information. (Lupert Letter, Exh. A). Defendant's counsel responded with the same rationale that was used to justify the deposition of Richard Weingarten. First, counsel suggested that Mr. DelBello had worked with waste companies that were business prospects of United Waste prior to 1992 and then had contact with Mr. Mathias during the prohibited period. Second, counsel stated that Mr. DelBello was one of the attorneys who had dealt with Mr. Mathias at the time the plaintiff had allegedly threatened to have "mob-related" lawyers bring frivolous litigation against the defendant. (Reilly Letter, Exh. C).

At his deposition, Mr. DelBello testified that sometime between 1989 and 1992 he met with Mr. Jacobs at Mr. Jacobs' house in Connecticut. The meeting was arranged because Mr. Jacobs was in the process of starting United Waste, and Mr. DelBello was acting as a consultant to waste disposal companies. (Affidavit of Alfred DelBello dated Jan. 11, 2000 ("DelBello Dep."), attached as Exh. E to Lupert Letter, at 17–22). However, Mr. DelBello never performed any work for United Waste at that time. (DelBello Dep. at 22–23). In addition, either at that meeting or thereafter, Mr. Jacobs or Richard Weingarten asked Mr. DelBello to set up a meeting between United Waste and a company called Liberty Environmental Systems ("Liberty"), for whom Mr. DelBello was providing consulting services. (DelBello Dep. at 23, 27–34). Finally, in 1994 and 1995, Mr. DelBello and members of his firm provided advice to Mr. Jacobs on regulatory matters concerning a landfill in West Virginia. (DelBello Dep. at 44–57).

The deposition questioning then diverged from the issue of Mr. DelBello's contacts with the plaintiff and the defendant. First, defendant's counsel began questioning him

about complaints that a sludge disposal contract had been awarded by Westchester County to Liberty because of its political influence. (DelBello Dep. at 66–73). Although plaintiff's counsel allowed the questioning to proceed, he objected on the grounds that it was harassing and irrelevant. (DelBello Dep. at 71–73).

Defendant's counsel then began to question Mr. DelBello about allegations that he knew organized crime figures. (DelBello Dep. at 87–100). Again, plaintiff's counsel objected, and Mr. DelBello commented that the inquiry was insulting. (DelBello Dep. at 91–93, 99). Counsel then asked Mr. DelBello about alleged campaign fundraising improprieties during the late 1960's and early 1970's. (DelBello Dep. at 109–13). Plaintiff's attorney objected. (DelBello Dep. at 111–13). Next, defendant's counsel inquired whether it was ethical for a former government official to deal with the government in which he formerly served, and plaintiff's counsel objected. (DelBello Dep. at 124–27). Finally, Mr. Jacobs' attorney questioned Mr. DelBello about someone who had had a business relationship with Mr. DelBello's wife and who had been convicted of bank fraud. (DelBello Dep. at 127–30). Plaintiff's counsel noted that he did not consider this inquiry relevant. (DelBello Dep. at 129).

Following the depositions of Mr. Weingarten and Mr. DelBello, plaintiff's counsel submitted a letter application seeking sanctions with respect to both examinations on grounds that they had been conducted without any good faith basis for believing that they would elicit relevant information and only for purposes of harassment. Mr. Mathias' attorneys also sought an order preventing the dissemination of the transcripts of both depositions and the videotape of the DelBello deposition. Defendant's counsel responded by reiterating the arguments previously made to their adversaries that the deponents were thought to have pertinent information going both to the issue of prohibited contacts and to the issue of duress. In addition, the defendant argued that the plaintiff is not entitled to relief because he failed to specify the basis on which he was seeking relief, because the Court lacks authority to impose

the sanctions requested, and because plaintiff's counsel waived his objections to the DelBello deposition. Further, the defendant contended that the plaintiff has not overcome the presumption that discovery materials including deposition transcripts are open to public inspection.

### A. Notice

■ The complaint of defendant's counsel that they have received inadequate notice of the basis for the plaintiff's sanctions motion is without merit. The party or attorney who is the subject of a sanctions motion is entitled to notice of "(1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense." *Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 334 (2d Cir.1999).

An attorney whom the court proposes to sanction must receive specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on the matter, and must be forewarned of the authority under which sanctions are being considered, and given a chance to defend himself against specific charges.

*Sakon v. Andreo,* 119 F.3d 109, 114 (2d Cir. 1997) (citation and internal quotation marks omitted).

In *Sakon,* these requirements were not met. There the district court had set aside an order dismissing the action because the plaintiffs had missed the deadline for filing an amended complaint. *Id.* at 111–12. However, the court vacated the dismissal on the condition that the plaintiffs' attorney pay attorneys' fees and costs to the defendants. *Id.* at 112. In overturning these sanctions, the Second Circuit noted that the only motions pending before the district court were the defendants' motion to dismiss and the plaintiffs' motion to set aside the order striking the original complaint. *Id.* at 114. The defendants' motion had not sought monetary sanctions as an alternative to dismissal. *Id.* Thus, plaintiffs' counsel had no inkling that the court was considering any sanction, let alone the factual or legal basis for it.

By contrast, the defendant and his attorneys received ample notice here. Although plaintiff's counsel did not identify in their initial application the legal basis for the sanctions sought, they did so in their reply papers. They specifically indicated that the application was brought pursuant to Rule 26(g) of the Federal Rules of Civil Procedure as well as the inherent powers of the Court to supervise and control discovery. (Reilly Reply Letter at 2). Furthermore, plaintiff's counsel specifically identified the conduct that they alleged to be sanctionable: proceeding with the Weingarten and DelBello depositions only for purposes of harassment and without adequate basis to believe that these witnesses possessed relevant information. Moreover, at the sanctions hearing, defendant's counsel did not suggest that they were unaware of the legal or factual premises for the plaintiff's application. On the contrary, they appeared fully prepared to address each of the plaintiff's arguments. Thus, they cannot claim to have been deprived of due process.

### B. *Authority for Sanctions*

Rule 26(g) provides in pertinent part as follows:

(2) Every discovery request, response, or objection made by a party represented by an attorney shall be signed by at least one attorney of record.... The signature of the attorney or party constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request, response, or objection is:

(A) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;

(B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and

(C) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

. . .

(3) If without substantial justification a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

Thus, if defendant's counsel signed the deposition subpoenas for Mr. Weingarten and Mr. DelBello without reasonable inquiry into whether these witnesses would have relevant information or for the purpose of harassing the witnesses or the plaintiff, sanctions would be appropriate under Rule 26(g).

Similarly, it is within the Court's inherent power to sanction an attorney or a party who conducts litigation "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (citations and internal quotations omitted); *see also Revson v. Cinque & Cinque, P.C.*, 70 F.Supp.2d 415, 437 (S.D.N.Y.1999). It is well-established that this authority to sanction applies to abuses of the discovery process. *See Carroll v. The Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 293 (5th Cir.1997); *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266–67 (10th Cir.1995); *Church of Scientology International v. Time Warner, Inc.*, No. 92 Civ. 3024, 1994 WL 38677, at *2 (S.D.N.Y. Feb. 4, 1994).

Nevertheless, defendant's counsel contend that the Court lacks authority to enforce the January 14, 2000 Order that permitted the Weingarten deposition to go forward on the condition that costs would be shifted in the event that the deposition failed to uncover relevant information. This argument fails on two grounds. First, counsel did not appeal the order when it was issued. Rule 72(a) of the Federal Rules of Civil Procedure provides that with respect to an order issued by a magistrate judge on any non-dispositive matter, a party has ten days

to file objections with the district judge; "a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made." Therefore, any challenge to the January 14, 2000 Order has been waived. *See Sunview Condominium Association v. Flexel International, Ltd.*, 116 F.3d 962, 964–65 (1st Cir. 1997); *CNPq–Conselho Nacional de Desenvolvimento Cientifico e Technologico v. Inter–Trade, Inc.*, 50 F.3d 56, 58–59 (D.C.Cir. 1995).

 Second, and more importantly, the Court has the power to issue conditional orders in discovery matters. The plaintiff originally sought a protective order precluding altogether the deposition of Richard Weingarten. Rule 26(c), however, permits a court to issue a protective order permitting discovery "only on specified terms and conditions." Thus, the order allowing the deposition to go forward on the condition that the defendant's attorneys pay the costs if the exercise proved fruitless was well within the scope of Rule 26. Moreover, the courts have the inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash Railroad Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). When confronted with doubtful assertions concerning the potential value of discovery, the court sometimes lacks sufficient information to make a clear determination whether the discovery is warranted. In such circumstances, it is appropriate to shift the risk of error to the party that contends that there is a reasonable basis for seeking the discovery. This type of flexibility is necessary to achieve efficient pretrial management and lies comfortably within the Court's inherent power.

### C. Waiver

 Defendant's counsel also contend that the plaintiff waived any objection to the DelBello deposition in particular by failing to move for a protective order and by failing to object during the examination. However, there is no "safe harbor" in Rule 26(g) that requires a party to seek a protective order prior to a deposition in order to be able to seek sanctions after the examination has been completed. Moreover, with respect to the questioning that strayed beyond the subject matter of the litigation, plaintiff's counsel frequently voiced his objections, as detailed above.

### D. Weingarten Deposition

 Defendant's counsel had no reasonable basis for proceeding with the deposition of Richard Weingarten. Mr. Mathias had testified at his deposition about a meeting with Mr. Jacobs at which they discussed having United Waste develop a business relationship with Liberty. (Deposition of Michael Ned Mathias dated Dec. 16, 1999 ("Mathias Dep."), attached as Exh. C to Lupert Letter, at 496–500). Mr. Mathias remembered the other persons present as being only Mr. DelBello and Mark Weingarten. (Mathias Dep. at 497). Mr. DelBello confirmed that this meeting took place but testified that Richard Weingarten was also present. (DelBello Dep. at 16–19). According to Mr. DelBello, Mr. Weingarten had suggested the meeting because he knew that United Waste was just starting up and that Mr. DelBello had a background in waste management. (DelBello Dep. at 17–18).

However, it is undisputed that Mr. Weingarten never represented United Waste or, indeed, any client in the waste industry. (Weingarten Dep. at 21–23). Thus, the representation by defendant's counsel that "Weingarten worked with waste companies which were prospects" during the period between 1989 and 1992 is simply unfounded. (Reilly Letter, Exh. C). Moreover, there was no reasonable basis for believing that he fell into any category that would have made him a prohibited contact under the Non–Compete Agreement: he had no business relationship with United Waste; he was not a customer, supplier, banker or lender of the company; he was not a waste generator, hauler, collector, or disposer; and he was not the owner or operator of a landfill or of disposal or transfer facilities. (Lupert Letter, Exh. B ¶ 5(b)(A)). Thus, it was not appropriate to depose Mr. Weingarten with respect to the prohibited contacts defense.

 The analysis regarding the duress defense is slightly different. Mr. Jacobs as-

serted that Mr. Mathias had threatened to recruit a "mob-connected" lawyer to burden him with baseless litigation. (Lupert Letter, Exh. I). The defendant then testified that he believed that Mr. Mathias had been referring to Richard Weingarten. (Deposition of Bradley S. Jacobs dated Sept. 8, 1999, attached as Exh. J to Lupert Letter, at 226). But by failing to ask a single question of Mr. Weingarten regarding this defense, defendant's counsel abandoned this theory and cannot rely on it as a basis for justifying the deposition.

The defendant's attorneys were given the opportunity to demonstrate that their estimate of the value of Mr. Weingarten's testimony was correct by taking his deposition. That deposition yielded nothing. Counsel must now pay for the fishing license that they solicited.

### E. *DelBello Deposition*

 By contrast, defendant's counsel did have a reasonable basis for seeking Mr. DelBello's deposition with respect to the prohibited contacts defense. He had been a consultant for Liberty and had discussed potential business dealings with Mr. Jacobs and United Waste. Counsel were thus entitled to explore the extent of these discussions as well as the possibility that Mr. Mathias might have communicated with Mr. DelBello during the prohibited period.

 The same cannot be said for deposing Mr. DelBello on the duress defense. Mr. Jacobs had already stated that it was Mr. Weingarten that he suspected of being the lawyer with ties to organized crime. Mr. DelBello could certainly shed no light on whether Mr. Mathias had actually threatened Mr. Jacobs or how Mr. Jacobs perceived any threat.

Moreover, the questioning of Mr. DelBello demonstrates that this aspect of the deposition was pursued in bad faith. Inquiries about campaign financing in the early 1970's, about a disgraced former business associate of Mr. DelBello's wife, or about allegations of

political influence in the awarding of a contract could only have been designed to embarrass the witness. Therefore, defendant's counsel are liable for sanctions for that portion of Mr. DelBello's deposition attributable to the duress issue.

### F. *Sanctions*

 The plaintiff seeks compensation for three hours of attorney time for the Weingarten deposition and four hours for the DelBello deposition, all at an hourly rate of $225.00. He also requests reimbursement of $144.79 for the cost of his copy of the videotape of Mr. DelBello's deposition. Both the rate billed and the time expended are quite modest. Therefore, the plaintiff shall be fully compensated for the cost of the Weingarten deposition and shall be reimbursed for half of the expenses of the DelBello deposition in light of the fact that roughly half of the time was spent on irrelevant and harassing questions purportedly related to the duress issue while the balance was devoted to legitimate inquiry about prohibited contacts. The plaintiff is also entitled to full reimbursement for the cost of the videotape. If a party chooses to increase the cost of litigation by utilizing more expensive means of memorializing a deposition, it should bear the expense.[1]

 The plaintiff also requests reimbursement for Mr. Weingarten and Mr. DelBello for the time they spent being deposed and, in Mr. Weingarten's case, traveling to his deposition. Defendant's counsel argue that there is no authority for such an award. That is incorrect. Rule 26(g) provides for "an appropriate sanction," and although it identifies attorneys' fees and costs as such remedies, it does not exclude others. Indeed, it would be anomalous to make whole a party who has incurred attorneys' fees as the result of unfounded discovery while denying any remedy to a non-party deponent. Mr. DelBello seeks compensation for 3.25 hours at $325.00 per hour, which is his customary billing rate. The rate is reasonable, but because half of the deposition involved appro-

---

1. There is no argument that the deposition was videotaped for use at trial since Mr. DelBello is within the subpoena power of the Court.

priate examination, he shall be reimbursed only for 1.62 hours. Mr. Weingarten seeks compensation for .75 hours of deposition time and 1.25 hours of travel time, also at $325.00 per hour. Because he is retired, Mr. Weingarten has no "customary" billing rate, but asks to be reimbursed at the same rate as Mr. DelBello. There is no basis for doing so.

It may be that a rate could be estimated to value a retiree's time. However, the plaintiff has offered no basis for doing so here, and billing Mr. Weingarten at the rate of an active senior partner would be arbitrary.

Accordingly, defendant's counsel are liable for sanctions as follows:

| Task | Type | Rate | Time | Amount |
| --- | --- | --- | --- | --- |
| Weingarten Deposition | Attorneys' Fees | $225/hr. | 3.0 hours | $675.00 |
| DelBello Deposition | Attorneys' Fees | $225/hr. | 2.0 hours | $450.00 |
| | Videotape | | | $ 72.40 |
| | Witness Time | $325/hr. | 1.62 hours | $526.50 |
| | | | Total | $1,723.90 |

### G. *Sealing of Discovery Material*

Finally, the plaintiff seeks an order preventing the dissemination of the videotape of the DelBello deposition and the transcript of either examination. Although this request is couched in terms of a remedy for discovery abuse, it is effectively a motion for a protective order. As such, the burden is on the plaintiff to demonstrate that there is good cause to grant the relief requested. Fed.R.Civ.P. 26(c); *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986). To prevail, Mr. Mathias must overcome the presumption that discovery materials are open to public inspection. *See Hawley v. Hall*, 131 F.R.D. 578, 581 (D.Nev.1990).

That burden has not been met. The plaintiff only argues in general terms that defendant's counsel sought irrelevant information and made embarrassing inquiries. But "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Cipollone*, 785 F.2d at 1121. Here, the claims of potential embarrassment are insufficient. "[B]ecause release of information not intended by the [deponent] to be for public consumption will almost always have some tendency to embarrass, an applicant for

a protective order whose chief concern is embarrassment must demonstrate that the embarrassment will be particularly serious." *Id.* That has not been accomplished in this case. The plaintiff has not identified the substance of any information gleaned from Mr. Weingarten's deposition that might be embarrassing. While some of the allegations raised at the DelBello deposition might be discomfiting, they are all old news, and their shock value has long since passed. Accordingly, the request to bar release of the depositions is denied.

### *Conclusion*

For the reasons set forth above, the defendant's motion to dismiss the complaint or for imposition of an adverse inference against the plaintiff is denied. However, as a sanction for the destruction of evidence, the plaintiff shall pay to the defendant $28,271.75, representing the costs reasonably incurred as a consequence of the spoliation.

The plaintiff's motion for discovery sanctions is granted to the extent that there was no reasonable basis for proceeding with the Weingarten deposition nor for pursuing questions related to the duress defense at the DelBello deposition. Defendant's counsel are therefore liable to the plaintiff for

$1,197.40 and to Mr. DelBello for $526.50.[2]

2. If any party questions the attribution of responsibility to plaintiff (rather than his counsel) and to defendant's counsel (rather than to the defendant himself), they may request a further hearing within ten days.